NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

## IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.C.

No. 1 CA-JV 24-0017

FILED 07-30-2024

---

Appeal from the Superior Court in Maricopa County
JD40530
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Oscar C., Tucson
*Appellant*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Advisory Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee Child*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge D. Steven Williams joined.

---

**K I L E Y**, Judge:

¶1        Oscar C. ("Father") appeals the juvenile court's order terminating his parental rights to his daughter, C.C. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Alysha R. ("Mother") are the parents of C.C., who was born in February 2021.

¶3        Viewed in the "light most favorable to sustaining the juvenile court's order," *In re O.M.*, 254 Ariz. 543, 544, ¶ 3 (App. 2023), the record shows that C.C. was born substance-exposed and exhibiting "withdrawal symptoms in the form of tremors." Hospital personnel contacted the Department of Child Safety ("DCS").

¶4        Two days after giving birth, Mother left the hospital against medical advice and, according to hospital staff, "high as a kite." A DCS case worker contacted Father, and the two met at the hospital. During their meeting, Father disclosed a history of substance abuse, including a conviction for driving under the influence ("DUI") in 2013 that resulted in a four-year prison term. Acknowledging past use of methamphetamine and cocaine, Father denied any recent use of illicit drugs and agreed to submit to a hair follicle test.

¶5        The following day, Father disclosed to the DCS case worker that he was on release from prison and that a warrant for his arrest was outstanding because he had violated his release conditions. When asked how he would care for C.C. if he were "pick[ed] up by the police and taken back to prison," Father replied that "he had a plan," explaining that he would call his parole officer "and get everything . . . dropped." When asked if he had used illegal drugs within the last three months, Father admitted that he "might have." A few days later, DCS received the test results of Father's hair follicle test, which were positive for methamphetamine.

¶6          Based on Father's substance abuse and inability to meet C.C.'s needs, DCS placed C.C. with her maternal grandparents and began dependency proceedings. DCS then referred Father for various reunification services, including drug testing, individual counseling, parenting classes, parent aide services, supervised visitation, and substance abuse treatment, and offered to provide him with transportation to and from the services.

¶7          Toward the end of February 2021, Father was arrested on the outstanding warrant. He remained incarcerated until early May 2021. While Father was incarcerated, many of the referred services were closed for lack of engagement.

¶8          Following Father's release from custody, a dependency hearing was held. Father failed to appear. The juvenile court found C.C. dependent due to Father's substance abuse and neglect and affirmed the child's placement with her maternal grandparents.

¶9          In June 2021, Father reinitiated contact with DCS and began undergoing substance abuse testing. For roughly two months, Father underwent testing with negative results (although he occasionally missed scheduled tests). In late August 2021, however, Father tested positive for methamphetamine. After that, he participated in no further testing for the rest of the year.

¶10          Father was assigned a parent aide in September 2021, but the service was closed out in November 2021 due to his "lack of engagement." DCS also referred him to a case aide to facilitate visitation with C.C. The case aide was unable to contact Father before the first scheduled visit in August 2021, however, and the visit was cancelled.

¶11          C.C.'s maternal grandmother unexpectedly died in September 2021 and her maternal grandfather was unable to continue caring for the child on his own. Additional maternal relatives tried to help but ultimately decided they, too, could not care for the child on a long-term basis. After "months of inconsistent communication," a DCS caseworker was able to contact Father in January 2022 to discuss C.C.'s placement. When the caseworker asked Father to suggest potential kinship placements, he suggested his adult daughter, but was able to provide only her name,

with no other contact information. DCS eventually made contact with Father's adult daughter, who declined to serve as placement.[1]

¶12  The same month, Father asked for renewed visitation services. DCS made a new referral for a visitation supervisor. Father also underwent a single drug test in early January 2022 with negative results. After that, he was required to participate in random testing, and so was directed to call the testing center on a daily basis to learn whether he was required to come in to provide a test sample. Although Father called the testing center on several different dates in January and February to determine if he had been selected to test that day, Father did not call in on a daily basis as required. And on days when he called and was told he had been selected to test, he never showed up at the facility to provide a sample.

¶13  In February 2022, police officers stopped Father's vehicle after observing him driving erratically. After questioning Father and administering field sobriety tests, the officers arrested Father on suspicion of DUI. A search of Father's vehicle uncovered two loaded semi-automatic handguns; a box of ammunition; a plastic bag containing 258 grams of methamphetamine; and a ledger listing names and dollar figures. In addition to DUI-related charges, Father was charged with numerous felonies involving the transportation and sale of a dangerous drug and the possession of weapons by a prohibited possessor. He has been in custody ever since.

¶14  Unaware of Father's incarceration, DCS officials closed out his referral for supervised visitation in March 2022 due to lack of contact from him. That same month, unable to identify an appropriate kinship placement for C.C., DCS transferred her from the paternal grandfather's care to a licensed foster care home.

¶15  Following months of no contact, Father reached out to DCS from jail in June 2022 by letter and phone calls. DCS urged him to maintain contact with C.C. by mailing letters and gifts for her to DCS, which would then deliver them to C.C. Father sent a letter to C.C. in November 2022.

---

[1] Father complains that DCS did not call his adult daughter and, instead, "she called DCS." Although he faults DCS for not initiating contact with his daughter, he does not dispute that he never provided DCS with her contact information. In any event, regardless of who initiated the contact, it is undisputed that when Father's adult daughter spoke with the DCS caseworker, she declined to serve as placement.

**¶16**     In November 2022, Father entered a plea agreement on his criminal charges and was sentenced to six years in prison. Since then, Father has voluntarily participated in various programs offered by the Arizona Department of Corrections, Rehabilitation, and Re-Entry ("ADOC") such as parenting skills, substance abuse, and anger management classes. Additionally, at Father's request, DCS began facilitating virtual visitation with C.C. through ADOC.

**¶17**     In the summer of 2023, Mother agreed to relinquish her parental rights to C.C.

**¶18**     In October 2023, DCS moved to terminate Father's parental rights on 15-months' out-of-home placement grounds under A.R.S. § 8-533(B)(8)(c). By that time, C.C. had spent her entire life, more than two and one-half years, in out-of-home placement.

**¶19**     The juvenile court held a termination adjudication hearing in December 2023. At the hearing, a DCS caseworker described the circumstances that led to C.C. being taken into care and the efforts that DCS made to reunify Father with his child. The caseworker testified that Father had not remedied the circumstances that led to the child being taken into care, explaining that he had been "in and out of incarceration" and had not demonstrated an ability to maintain sobriety. She further testified that C.C. is well cared for by her current placement, whom C.C. "loves . . . very much," and that the placement wants to adopt C.C.

**¶20**     On cross-examination, the caseworker acknowledged that after his incarceration Father participated in self-improvement classes offered by ADOC. In his testimony, Father likewise asserted that he had taken parenting skills, substance abuse, and anger management classes to help him improve his ability to parent C.C. when he is released. He acknowledged that he did not consistently maintain contact with DCS before his incarceration, but explained that at the time he "was having issues with" his phone, which, he claimed, "had been hacked." He stated that when the DCS caseworker tried to reach him, he often "wouldn't get" the calls, and when he tried to call the caseworker, his phone would "call[] someplace else." "It was never that I wasn't trying to get in touch with them," he insisted. "[M]y phone was just all messed up." Father concluded by asking the court not to terminate his parental rights and instead to give him a "chance" to "prove myself, redeem myself."

**¶21**     Shortly after the hearing concluded, the juvenile court issued a lengthy ruling finding, among other things, that: (1) C.C. had been in out-

of-home placement for longer than fifteen months; (2) Father failed to "maintain his sobriety outside a controlled setting" or "demonstrate behavioral changes sufficient to ensure an ability to safely parent [C.C.]," and so had not remedied the circumstances causing C.C.'s out-of-home placement; and (3) "the duration and severity of [Father's] substance abuse and his term of incarceration" demonstrated that he "will not be capable of exercising proper and effective parental care and control in the near future." The court further found that DCS made a diligent effort to provide reunification services, discussing, in some detail, the substance abuse, parent aide, transportation, and visitation services that DCS offered.

**¶22**        The court went on to find that termination was in C.C.'s best interests because she was "closely bonded" to her foster mother, who wants to adopt her, and that it was "not in [C.C.'s] best interest to linger in foster care" based on "the hope that someday after [Father]'s release from custody he will maintain his sobriety and provide [her] with a safe home." The court therefore terminated Father's parental rights to C.C.

**¶23**        Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶24**        Father's appellate counsel filed a notice and affidavit under Ariz. R.P. Juv. Ct. 607(e) avowing that counsel had reviewed the record and found no non-frivolous issues to raise on appeal. Father filed an opening brief *in propria persona* asking this court to "overturn [the] decision" of the juvenile court. DCS urges us to disregard Father's arguments entirely because his brief does not include citations to legal authority or references to the record as required by Arizona Rule of Civil Appellate Procedure 13.

**¶25**        "[T]he best interests of [a] child trump the consequences ordinarily imposed for violations of the rules." *Nold v. Nold*, 232 Ariz. 270, 273, ¶ 10 (App. 2013). Despite the deficiencies in Father's brief, therefore, we will, in our discretion, address the merits of his arguments to the extent they are sufficiently developed.

### A. Father Waived His "Ineffective Assistance of Counsel" Argument by Failing to Adequately Present It.

**¶26**        At the termination adjudication hearing, Father's counsel elicited testimony from the DCS caseworker and Father about the efforts Father has made since his incarceration to improve his ability to parent C.C. Although a review of the hearing transcript shows that counsel skillfully

elicited evidence designed to bolster Father's position, Father now argues that the termination order should be set aside because his counsel was ineffective.

**¶27** An order terminating parental rights may be set aside if the counsel's representation of the parent "was such that it undermined the fundamental fairness of the proceeding and cast doubt on the proceeding's protection of the individual against arbitrary action of government." *Royce C. v. Dep't of Child Safety*, 252 Ariz. 129, 136, ¶ 20 (App. 2021) (cleaned up). Relief on these grounds is "an extraordinary remedy, unavailable in all but the most egregious cases." *Id.* at 138, ¶ 26. To grant relief on this basis, the court must find that counsel's conduct was so deficient "that it denie[d] the parent fundamental fairness or shock[ed] the conscience," and that but for counsel's deficient performance the outcome may have been different. *Id.* at 138, ¶¶ 25–26. A parent alleging ineffective assistance of counsel bears the burden of establishing his claim. *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 325, ¶¶ 18–19 (App. 2007).

**¶28** According to Father, his counsel was ineffective because she "didn't know basic facts of [his] case" and was "confused on dates," which "led to [him] looking disingenuous." Father does not, however, identify any "basic fact[]" or specific "date[]" about which his counsel was purportedly "confused," nor does he explain how counsel's alleged confusion caused him to appear "disingenuous." Because Father has not developed this argument, we reject his cryptic claim that his counsel's supposed confusion about "basic facts" and "dates" somehow harmed his case or otherwise rendered his counsel ineffective.

## B. The Record Supports the Juvenile Court's Termination Order.

**¶29** Father argues, next, that the termination order should be set aside because DCS did not satisfy its statutory obligation to make reasonable reunification efforts.

**¶30** A parent's right to the custody and control of his child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interest. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). This Court will accept the juvenile court's factual findings "if reasonable evidence and inferences support them," and will affirm the

court's finding of statutory grounds for termination unless, "as a matter of law," "no one could reasonably find the evidence to be clear and convincing." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478-79, ¶¶ 30–31 (2023).

**¶31**        To establish grounds for termination under A.R.S. § 8-533(B)(8)(c), DCS is required to prove, by clear and convincing evidence that (1) the child has been in "an out-of-home placement for a cumulative total period of fifteen months or longer," (2) the parent has been "unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (3) there is a "substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c).

**¶32**        Here, the court found all three factors present. These court's findings are supported by ample evidence in the record, and Father does not challenge them. Likewise, Father does not challenge the court's determination that terminating his parental rights was in C.C.'s best interests. We therefore affirm all of these unchallenged findings. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, 238, ¶ 14 n.6, ¶ 28 (App. 2011) (affirming termination and noting that parent's failure to challenge juvenile court's finding of statutory grounds for termination resulted in waiver).

**¶33**        Father argues that DCS did not make diligent efforts to preserve his parent-child relationship with C.C. According to Father, DCS maintained "inconsistent contact" with him "before and after [his] incarceration" and offered him inadequate services ever since.

**¶34**        Before a parent's rights are terminated on out-of-home placement grounds, DCS must establish, by clear and convincing evidence, that it made "a diligent effort to provide appropriate reunification services." A.R.S. § 8-533(B)(8). Though the efforts required vary depending on the circumstances of each case, DCS must, at a minimum,

> identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult.

*Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, ¶ 50 (App. 2019) (emphasis omitted). A parent's incarceration does not relieve DCS of its obligation to

provide reunification services. *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582, ¶ 21 (2021). On the contrary, DCS must "initiate measures designed to address an incarcerated parent's desire to maintain a parent-child relationship," "such as visitation," if "providing the services will not endanger the child." *Id.* DCS is not, however, required to ensure parental participation in provided services, *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994), nor must it "undertake rehabilitative measures that are futile," *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

¶35            Reasonable evidence supports the juvenile court's finding that DCS made diligent efforts towards reunification. The record shows that, over the course of over two and a half years, DCS attempted to provide Father with reunification services, including substance abuse treatment and a parent aide, intended to remedy the circumstances causing the dependency. Father failed to consistently participate in these services. After testing positive for methamphetamine in August 2021, for example, Father ceased participating in substance abuse testing until early January 2022, when he tested once and then stopped testing again. Father's subsequent incarceration on drug charges in February 2022 demonstrates his continued failure to address his substance abuse issues.

¶36            The record also shows that DCS consistently attempted to maintain contact with Father, with mixed success. DCS lost contact with Father when he was arrested in May 2021, and again when he was arrested in February 2022. Even when Father was out of custody, DCS had difficulty reaching him to arrange for his participation in services.

¶37            Father testified at the hearing that he did not consistently maintain contact with DCS because he "was having issues with [his] phone at that time." He did not, however, explain why he didn't obtain another, more reliable phone, or use a pay phone to contact the DCS caseworker. Indeed, as the juvenile court noted, the fact that Father called the drug testing facility on several days in January and February of 2022 shows that he had access to a working phone. Father offers no explanation for why he could not have used that same phone to stay in contact with DCS.

¶38            Further, Father's difficulties with reliable phone service, even if true, provide no basis on which to fault DCS's attempts to provide appropriate reunification services. DCS consistently attempted to provide services. The agency "is not required . . . to ensure that a parent participates in each service it offers," *Christina G.*, 227 Ariz. at 235, ¶ 15 (cleaned up), and a parent has a responsibility to maintain contact with DCS to access the

services that are offered, *see Maricopa Cnty. Juv. Action No. JS–4283*, 133 Ariz. 598, 601 (App. 1982) (noting that the parent is "required to make a good faith effort to reunite the family"); *see also Pima Cnty., Severance Action No. S-110*, 27 Ariz. App. 553, 556 (1976) (rejecting parent's argument that DCS "should have done more to reunite her with her child" and noting that parent "had not communicated with the child while he was living in foster homes" and made only "sporadic inquiries as to the child's well-being").

¶39 To be sure, after his incarceration, Father consistently engaged in "virtual visits" with C.C. But the fact that he has been able to virtually visit with C.C. only bolsters DCS's assertion that it has diligently tried to reunify Father and C.C. To the extent Father faults DCS for failing, after his incarceration, to provide services beyond virtual visitation, he never requested any additional services, nor does he identify any other service DCS should have offered but didn't. On this record, Father is not entitled to relief. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014) (parent waives objection to alleged inadequacy of reunification services by failing to raise the issue promptly to give juvenile court and DCS "a reasonable opportunity to address the matter").

¶40 Father next argues that DCS made insufficient efforts to contact C.C.'s paternal relatives when seeking an appropriate kinship placement, did not "formally" provide a case plan after his incarceration, and "blindsided" him by "abruptly" changing the case plan from reunification to severance and adoption.

¶41 Father lacks standing to challenge DCS's failure to place C.C. with a paternal relative. *See Antonio M. v. Arizona Dep't of Econ. Sec.*, 222 Ariz. 369, 370, ¶ 2 (App. 2009) (noting that a parent whose rights were terminated "no longer ha[s] standing to challenge [the child's] placement and anticipated adoption"). In any event, he never identified any paternal relative who could serve as placement other than his adult daughter, who declined to do so. Because Father never identified a paternal relative who was willing to serve as C.C.'s placement, he cannot fairly fault DCS for failing to find one.

¶42 Father's complaint that he was not adequately kept informed of the case plan also lacks merit. Father did not appear at the dependency hearing in June 2021 at which the case plan of reunification was adopted, nor did he appear at review hearing held in September 2021. He was not in custody on the date of either hearing and offers no justification for his absence. After his incarceration in February 2022, Father began making regular appearances at review hearings beginning on July 1, 2022. As part

of each hearing, the juvenile court ordered that DCS provide Father and the court with a report within fifteen days of the next scheduled hearing. DCS provided the reports as required. On October 5, 2023, DCS served its motion to change the case plan from reunification to termination on Father through his counsel. Although he claims to have been "blindsided" by the purportedly "abrupt[]" change in case plan, he does not allege, much less establish, that he did not have enough time to prepare for the termination hearing two months later. We reject Father's claim that he was not kept informed of the case plan during the proceedings.

¶43 Finally, Father argues that he did not timely receive the termination order, citing a purported discrepancy between the date of the order and the date of the postmark on the envelope it came in. Because Father filed a timely notice of appeal, a brief delay, if any, in his receipt of the termination order does not entitle him to relief.

## CONCLUSION

¶44 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AGFV